IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**JENNIFER BRANDT-STERRETT,**            Case No. 3:18 CV 794

    Plaintiff,                                  Judge Jack Zouhary

    v.                                         Magistrate Judge James R. Knepp II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                           **REPORT AND RECOMMENDATION**

### INTRODUCTION

Plaintiff Jennifer Brandt-Sterrett ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated April 9, 2018). Following review, and for the reasons stated below, the undersigned recommends the decision of the Commissioner be affirmed.

### PROCEDURAL BACKGROUND

Plaintiff filed for DIB and SSI in June 2014, alleging a disability onset date of July 17, 2012. (Tr. 512-18). Her claims were denied initially and upon reconsideration. (Tr. 430-36, 439-43). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 446-47). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on December 8, 2016. (Tr. 209-38). On January 24, 2017, the ALJ found Plaintiff not disabled in a written decision. (Tr. 32-52). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-4); *see* 20 C.F.R. §§

404.955, 404.981, 416.1455, 416.1481. Plaintiff timely filed the instant action on April 9, 2018. (Doc. 1).

**FACTUAL BACKGROUND**

Personal Background and Testimony

Plaintiff was born in October 1970, making her 42 years old at her alleged onset date and 46 years old at the time of the hearing. *See* Tr. 212. She had past work as a secretary and bookkeeper. (Tr. 213). At her secretarial job, Plaintiff sometimes also helped with miscellaneous tasks such as power washing the floors. (Tr. 214). Plaintiff estimated the heaviest lifting she did at this job was between 45-55 pounds. *Id*. Plaintiff also co-owned a flower shop with her mother in 2013 and 2014. (Tr. 215). There, her duties included checking inventory, supervising three to four employees, and lifting flower buckets weighing approximately 35-40 pounds each. (Tr. 215-16).

Plaintiff testified she was was unable to work due to pain in her right foot, left leg, neck, lower back, and left shoulder. (Tr. 216). She also suffered from chest pain, aggravated by stress, and regular migraines. *Id*.

Plaintiff lived in a house with her husband. (Tr. 213). She had a driver's license, but limited her driving due to pain in her right foot. *Id*. Plaintiff performed chores around the house, however, she needed "multiple breaks" in between each. (Tr. 217). She did not vacuum or mop. *Id*. Plaintiff cooked simple meals. (Tr. 218). She sometimes needed help getting out of the bathtub because her leg did not "work properly". *Id*.

Plaintiff did not have any hobbies, but previously scrapbooked regularly. (Tr. 217). She had to stop scrapbooking due to numbness and tingling in her hands. *Id*. Plaintiff taught Sunday school "for years" and was the craft director at her church for over twenty years. (Tr. 218). She stopped attending both due to hand pain and numbness. *Id*.

Plaintiff estimated she could sit 45-50 minutes at a time, but would be in "extreme pain" afterwards. (Tr. 219). She could walk one city block before losing her breath and stand for ten to fifteen minutes at a time. *Id*.

Relevant Medical Records

In July 2012, Plaintiff saw Dawn McNaughton, M.D., due to a recent onset of persistent fatigue with heat exposure. (Tr. 663). Dr. McNaughton referred Plaintiff to cardiologist Rajendra Kakarla, M.D., for further evaluation. *Id*.

Plaintiff saw Dr. Kakarla later in July 2012. (Tr. 714-15). She reported a history of congenital pulmonic stenosis with recent shortness of breath, palpitations, occasional dizziness, and left-sided chest pain. (Tr. 714). On examination, Plaintiff had normal sinus rhythm with a heart rate of 60 beats per minute. (Tr. 715). Dr. Kakarla ordered a 24-hour Holter monitor and an echocardiogram with Doppler. *Id*. He told Plaintiff to avoid caffeine and stay home from work for two weeks. *Id*.

Later that month, Plaintiff sought treatment at the emergency room for heat cramps, heat exhaustion, and possible stroke symptoms. (Tr. 716). On examination, Plaintiff had a regular heart rate and rhythm with normal sounds, and no gallops, rubs, or murmurs. (Tr. 717). She had clear breath sounds and no respiratory distress. *Id*. Providers ordered intravenous fluids and discharged Plaintiff to her home the same day in satisfactory condition. *Id*.

In August 2012, Plaintiff underwent echocardiogram testing. (Tr. 712). Testing revealed normal left ventricular systolic function, with no segmental wall motion abnormality, no evidence of atrial or vent mural thrombus, and no pericardial effusion. *Id*. Plaintiff had an increased pulmonic valve velocity "suggestive of mild to moderate pulmonic stenosis." *Id*. Plaintiff treated with Dr. Kakarla the same day, immediately following the test. (Tr. 711). Dr. Kakarla noted

3

Plaintiff had congenital pulmonic stenosis and "multiple vague symptoms"; he observed it was "unclear" if her symptoms were "related to her mild to moderate pulmonic stenosis." *Id*.

In October 2012, Plaintiff treated with cardiologist Balaji Tamarappoo, M.D. (Tr. 777-78). Plaintiff reported shortness of breath "with even minimal exertion", chest tightness, and occasional "twinges" of chest pain. (Tr. 777). On examination, Plaintiff had normal sinus rhythm with no murmurs, rubs, or gallops. (Tr. 778). A transesophageal echocardiogram revealed a prominent ridge in the supravalvular region consistent with supravalvular pulmonic stenosis. *Id*. Later that month, Plaintiff underwent a pulmonic valvuloplasty. (Tr. 1172).

In July 2013, Plaintiff saw cardiologist Richard Krasuski, M.D. (Tr. 690-94). Plaintiff reported immediate improvement following the procedure, however, she noted that progressive dyspnea and chest discomfort began approximately one week later. (Tr. 692). Examination revealed normal sinus rhythm with no systolic ejection murmur. (Tr. 693). Dr. Krasuski noted "[t]he valve gradient by echocardiography today looks pretty much as it did on the echocardiogram on the day after the procedure and there is only mild pulmonic valve regurgitation." (Tr. 694).

Plaintiff returned to Dr. Krasuski in March 2014. (Tr. 1250-54). She reported getting "progressively worse" after her last appointment in July 2013. (Tr. 1252). Plaintiff reported shortness of breath climbing less than one flight of stairs, when this happened, she also had sharp pains in the left mid-sternal region. *Id*. She denied orthopnea, syncope, or lightheadedness. *Id*. An echocardiogram revealed normal systolic function on both sides, and there was no interval progression of the pulmonic gradient. (Tr. 1253). Dr. Krasuski noted her symptoms were "in excess of the valvular stenosis" and referred Plaintiff for a pulmonary evaluation. (Tr. 1254).

Plaintiff underwent a pulmonary evaluation in March 2014. (Tr. 763-65). Providers found normal airway and lung parenchymal structure and function. (Tr. 765). She had normal spirometry

4

and "strongly normal" diffusion capacity, normal pulmonary perfusion, normal lung parenchyma, and normal alveolar capillary surface area for diffusion. *Id*.

Plaintiff saw Dr. Krasuski again in August 2014. (Tr. 755-56). Plaintiff reported worsening chest discomfort, but Dr. Krasuski stated he did not believe her symptoms were primarily driven by her heart valves and would not recommend another surgery. (Tr. 756). He recommended she get a second opinion from cardiologist Gosta Pettersson, M.D. *Id*. Plaintiff met with Dr. Pettersson in November 2014. (Tr. 1600-05). Like Dr. Krasuski, Dr. Pettersson did not recommend another valve surgery. (Tr. 1604).

In November 2014, Plaintiff treated at the Orthopedic Institute of Ohio. (Tr. 867-68). Plaintiff reported pain in her shoulders after lifting a bag of dog food. (Tr. 867). On examination, Plaintiff had a normal gait, excellent strength and range of motion in her right shoulder, and limited range of motion in her left. (Tr. 867-68).

In November 2015 and September 2016, Plaintiff underwent lower extremity venous Doppler studies. (Tr. 1055-56, 1637). Each revealed normal color flow bilaterally in Plaintiff's lower extremities. *Id*.

Plaintiff saw Dr. Kakarla in January 2016. (Tr. 1419-20). She reported occasional chest pain and palpitations, and shortness of breath on exertion. (Tr. 1419). On examination, Plaintiff had a systolic murmur. (Tr. 1420).

In April 2016, Plaintiff again treated with Dr. Kakarla. (Tr. 1424-29). She reported no new complaints. (Tr. 1424). An echocardiogram revealed normal sinus rhythm. (Tr. 1425). Later that month, Plaintiff underwent a Cardiolite stress test which revealed no evidence of reversible ischemia, no segmental wall motion abnormality, and preserved systolic thickening. (Tr. 1415).

Plaintiff treated at the Orthopedic Institute of Ohio again in April, May, and June 2016. (Tr. 1145-46, 1149-51, 1152-53). During some of these visits, Plaintiff reported neck and back pain and numbness in her lower extremities. (Tr. 1145, 1149). Providers found she had a normal gait on examination (Tr. 1145, 1149), and good muscle strength in her upper extremities (Tr. 1145, 1150).

In May 2016, Plaintiff reported "occasional" chest pains to Dr. Kakarla. (Tr. 1421). Her examination findings were unremarkable. (Tr. 1422). In August 2016, Plaintiff reported no chest pain, but had shortness of breath on exertion. (Tr. 1591). Again, examination findings were unremarkable. (Tr. 1592).

Opinion Evidence

*Treating Physician*

In October 2016, Dr. Kakarla completed a questionnaire regarding Plaintiff's functional limitations. (Tr. 1598-99). He listed Plaintiff's diagnoses as congenital pulmonic stenosis, mitral valve prolapse, and heart murmur. (Tr. 1598). He opined these conditions caused severe chronic pain for Plaintiff. *Id*. Because of these conditions, and the weakness, pain and fatigue they caused, Dr. Kakarla opined Plaintiff would need a break from work every fifteen to twenty minutes "until discomfort subsides in chest." *Id*. Plaintiff could could work two hours per day, sit for 30 minutes at a time, and stand for fifteen minutes at a time. *Id*. Dr. Kakarla found Plaintiff could not lift any amount of weight on a frequent[1] basis, and could lift five pounds on a rare[2] and occasional[3] basis. *Id*. Further, he found Plaintiff could rarely bend or balance, and could never stoop. *Id*. Plaintiff

---

1. The form defines "frequently" as 34% to 66% of an 8-hour working day. (Tr. 1098).

2. The form defines "rarely" as 1% to 5% of a working day. (Tr. 1098).

3. The form defines "occasionally" as 6% to 33% of a working day. (Tr. 1098).

would have difficulty performing repetitive hand movements due to hand numbness and tingling. *Id*. She could rarely perform fine manipulation and reach out with both arms; never raise her arms over her shoulders; and occasionally engage in gross manipulation. *Id*. Plaintiff needed to elevate her legs "heart high. . . most of the time". *Id*. She was unable to tolerate exposure to heat or smoke; and could not work around dangerous equipment or operate a motor vehicle. (Tr. 1599). She would likely be "off task" 25% or more of a workday. *Id*. Finally, Dr. Kakarla opined Plaintiff would be unable to complete an eight-hour workday, and would likely be absent four or more days per month. *Id*.

VE Testimony

A VE appeared and testified at the November 2016 hearing before the ALJ. *See* Tr. 228-36. The ALJ asked the VE to consider a person with Plaintiff's age, education, and vocational background who was physically and mentally limited in the way in which the ALJ determined Plaintiff to be. (Tr. 230-31). The VE opined such an individual could not perform Plaintiff's past work, but could perform other jobs such as a merchandise marker, office helper, or a photo copy machine operator. (Tr. 231-32).

ALJ Decision

In a written decision dated January 24, 2017, the ALJ found Plaintiff met the insured status requirements for DIB through March 31, 2019 and had not engaged in substantial gainful activity since her alleged onset date (July 17, 2012). (Tr. 34). He concluded Plaintiff had the severe impairments of: degenerative disk disease with osteoarthritis of the spine; pulmonary stenosis status-post mitral valve prolapse; migraines; varicose veins with intermittent edema of the lower extremities; foot disorder; obstructive sleep apnea; affective disorder; and anxiety disorder. (Tr. 35). However, the ALJ found none of these impairments (alone or in combination) met or

7

medically equaled the severity of a listed impairment. (Tr. 35). Next, the ALJ set forth Plaintiff's residual functional capacity ("RFC"):

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: allowed to sit or stand alternatively, at will, provided that she is not off task for more than 10 percent of the work period; postural limitation of no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs; occasional balancing, stooping, kneeling, crouching; no crawling; occasional use of the bilateral lower extremities for operation of foot controls; manipulative limitation of occasional use of the left upper extremity for overhead reaching; frequent use of the bilateral upper extremities for reaching, handling, and fingering; environmental limitation to avoid all exposure to hazards, such as dangerous moving machinery and unprotected heights; work limited to simple, routine, and repetitive tasks in a work environment free from fast paced production requirements, such as moving assembly lines and conveyor belts, involving only work related decisions, with few if any work place changes; occasional interaction with the general public, coworkers, and supervisors.

(Tr. 38). The ALJ found Plaintiff was unable to perform past relevant work (Tr. 49); was a "younger individual" on the alleged onset date; and had a high school education (Tr. 50). The ALJ concluded that, considering Plaintiff's age, education, work experience, and RFC, Plaintiff could perform jobs that existed in significant numbers in the national economy. *Id*. Thus, the ALJ found Plaintiff not disabled from July 17, 2012 (the alleged onset date), through the date of his decision. (Tr. 52).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact

if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) & 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in

the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff raises two challenges to the ALJ's decision: (1) the ALJ failed to provide "good reasons" for rejecting Dr. Karkala's opinion; and (2) the RFC is unsupported due to an unexplained limitation therein. The Commissioner responds that the ALJ's analysis of Dr. Kakarla's opinion, and the RFC, are supported by substantial evidence. For the reasons discussed below, the undersigned finds the ALJ's decision supported by substantial evidence and recommends the Commissioner's decision be affirmed.

<u>Treating Physician</u>

Plaintiff first argues the ALJ erred in failing to provide "good reasons" for rejecting the opinion of Plaintiff's treating cardiologist, Dr. Kakarla. (Doc. 11, at 6-10). For the reasons discussed below, the undersigned recommends the decision be affirmed in this regard.

Generally, medical opinions of treating physicians are accorded greater deference than non-treating physicians.[4] *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96–2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and

---

4. Although recent revisions to the CFR have changed the rules regarding evaluation of treating physician opinions, such changes apply to claims filed after March 27, 2017, and do not apply to claims filed prior to that date. *See* Social Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5852-53, 2017 WL 168819.

may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242.

A treating physician's opinion is given "controlling weight" if it is supported by: 1) medically acceptable clinical and laboratory diagnostic techniques; and 2) is not inconsistent with other substantial evidence in the case record. *Id.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).

Importantly, the ALJ must give "good reasons" for the weight he gives a treating physician's opinion, reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Wilson,* 378 F.3d at 544. When determining weight and articulating "good reasons", the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an in-depth or "exhaustive factor-by-factor analysis" to satisfy the requirement. *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

Here, after setting forth the treating physician standard, the ALJ addressed Dr. Kakarla's opinion and gave reasons for the weight assigned:

> Yet, controlling weight is not accorded to Dr. Kakarla's opinion because the objective evidence does not support the opinion (Exhibit 23F/l-2). Dr. Kakarla's cardiology treatment records reflect the claimant has only occasional, mild chest discomfort and some shortness of breath upon exertion with her

11

> joints and muscles non-tender, which does not support the doctor's opinion of [sic] the claimant suffers from severe pain and she would need a break every 15 to 20 minutes (Exhibits 15F/58-62, 16F/1-11 and 22F/l-6). The above also does not support Dr. Kakarla's other opinions that the claimant could work only two hours per day and not complete an eight-hour workday, she could rarely bend or bend [sic], never stoop or tolerate exposure to heat/smoke and she would be absent from work more than four days per month and be off-task 25 percent or more.
>
> Further, Dr. Kakarla's opinion is not supported by the objective evidence from the claimant's other treatment physicians. Examinations by the claimant's orthopedic and neurological physicians consistently revealed that despite the claimant's obesity and pain complaints, she had a normal gait with full to only slightly diminished strength in the upper and lower extremities (Exhibits 8F/7-8, 12F/l-2, 5-7, 10-13, 15F/45-51 and 19F/l-4, 20). The above objective evidence does not support Dr. Kakarla's opinion regarding lifting or performing fine and gross manipulation, reaching out both arms and raising arms over shoulder. A pulmonary evaluation also showed normal airway and lung parenchymal structure and function while multiple Doppler studies exhibited normal color flow venous, which does not support the claimant needing numerous breaks or her legs needing to be elevated most of the time (Exhibits 3F/44, 7F/15-18, 11F/51-54, 12F/l-2, 13F/88, 14F/12 and 26F/l-2). Thus, little weight is accorded to Dr. Kakarla's opinion because the objective evidence does not support it.

(Tr. 45).

Contrary to Plaintiff's assertion, the ALJ gave several reasons for the weight he assigned to Dr. Kakarla's opinion. First, he noted that Dr. Kakarla's own treatment records did not support his finding that Plaintiff had severe pain and would need a break every fifteen to twenty minutes. (Tr. 45) (citing Tr. 1598-99). The ALJ accurately cited record evidence in support. *See* Tr. 45 (citing Tr. 1417, 1419, 1421-22, 1427, 1591, 1594 (only occasional, mild chest discomfort); Tr. 1419, 1421-22, 1427, 1591, 1595 (some shortness of breath, only on exertion); Tr. 1417, 1420, 1422, 1428, 1592, 1595 (non-tender muscles and joints)). The ALJ further noted that this evidence also did not support Dr. Kakarla's assertion that Plaintiff could work only two hours per day, rarely bend, never stoop, be absent from work more than four days per month, and be off-task 25% of the time. (Tr. 45) (citing Tr. 1598-99). The

12

ALJ's finding here that Dr. Kakarla's opinion is not supported by his own treatment records is supported by substantial evidence. Supportability is just one of the "good reasons" an ALJ may give when declining to assign a treating source less than controlling weight. *Rabbers*, 582 F.3d at 660 (citing 20 C.F.R. § 404.1527(d)(2)).

The ALJ also found Dr. Kakarla's opinion inconsistent with the objective medical evidence of record. (Tr. 45). The ALJ emphasized that a pulmonary evaluation showed normal airway and lung structure and function. *Id.* (citing Tr. 763-65) (March 2014 pulmonary evaluation)). He also cited Plaintiff's relatively normal color flow findings in Doppler studies of her legs. *Id.* (citing Tr. 1055-56, 1637-38). The ALJ reasonably found this objective evidence contradicted Dr. Kakarla's opinion that Plaintiff needed numerous breaks or needed to elevate her legs "most of the time". *Id.* (citing Tr. 1598-99). Finally, the ALJ cited other records which indicated, despite Plaintiff's pain complaints, she consistently "had a normal gait with full to only slightly diminished strength in the upper and lower extremities." *Id.* (citing Tr. 867-88 (November 2014 orthopedic visit showing normal gait and muscle strength); Tr. 1145-46 (June 2016 orthopedic visit showing same); Tr. 1149-50 (May 2016 orthopedic visit showing same)). The ALJ found this evidence contradicted Dr. Kakarla's opinion that Plaintiff had limited lifting and shoulder raising abilities. (Tr. 45) (citing 1598-99). As noted above, consistency and supportability are "good reasons" an ALJ may use when declining to assign controlling weight to a treating physician. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Wilson*, 343 F. App'x at 30. The ALJ thoroughly addressed these factors and, contrary to Plaintiff's assertion, cited several pieces of evidence in support.

Here, Plaintiff points to several pieces of evidence suggesting a contrary conclusion. (Doc. 11, at 9). However, this Court must affirm even if substantial evidence or indeed a preponderance

13

of the evidence supports a claimant's position, "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones,* 336 F.3d at 477.

For these reasons, the undersigned finds the ALJ's decision regarding Dr. Karkarla's opinion supported by substantial evidence, and recommends it be affirmed.

<u>The RFC</u>

Plaintiff next argues the ALJ's RFC is unsupported because it includes a "vague", unsupported limitation. Specifically, Plaintiff points to the limitation that she be "allowed to sit or stand alternatively, at will, provided that she is not off task for more than 10 percent of the work period." (Doc. 11, at 11) (citing Tr. 38). The Commissioner responds that this limitation is adequately supported because ALJ properly accounted for Plaintiff's need to change positions. (Doc. 14, at 12). For the reasons discussed below, the undersigned finds no error and recommends the decision be affirmed in this regard.

Here, the ALJ considered Plaintiff's pain complaints and fully explained his reasons for including a sit/stand option in the RFC:

> [t]he residual functional capacity also considered the claimant's alleged foot pain as well as her back and leg pain complaints in finding she is allowed to sit or stand alternatively at will and she is precluded from crawling. These limitations are despite the claimant not taking her prescribed pain medications on a regular basis even after admitting they were successful and some of her treating physicians suggesting her subjective complaints were in excess of the objective evidence.

(Tr. 46) (record citations omitted). Plaintiff does not dispute the inclusion of the sit/stand option, but takes issue with the "vague" qualification that she may not be off task for more than 10% of a workday. (Doc. 11, at 11). In support, Plaintiff notes that Dr. Kakarla opined she would be off-task for more than 25% of a workday. *Id*. (citing Tr. 1599). Thus, Plaintiff contends, "there is a basis for [her] being off task. Yet the ALJ completely failed to address the rationale for this limitation." (Doc. 11, at 12). It seems Plaintiff is arguing the ALJ should have agreed with Dr.

14

Kakarla and found she would be off-task *more* than 10% of a workday. However, as explained in detail above, Dr. Kakarla's opinion was accorded "little weight" because it was inconsistent with, and unsupported by, the record as a whole. *See* Tr. 45. In fact, the ALJ expressly found Dr. Kakarla's assertion that Plaintiff would be off-task 25% of the of time time, unsupported by his own treatment notes. (Tr. 45) (citing Tr. 1417, 1419, 1421-22, 1427, 1591, 1594 (only occasional, mild chest discomfort); Tr. 1419, 1421-22, 1427, 1591, 1595 (some shortness of breath, only on exertion); Tr. 1417, 1420, 1422, 1428, 1592, 1595 (non-tender muscles and joints)). Of note, Dr. Kakarla's off-task opinion was an estimate as to how often she would be off-task due to issues with attention and concentration which would interfere with her ability to perform simple tasks. (Tr. 1599). Here, the ALJ's 10% off-task limitation is based on the fact that the action of moving from standing to sitting will inevitably take you off task for a short period of time. Thus, the ALJ properly considered Plaintiff's need for a sit/stand opinion and provided the required "good reasons" when he assigned little weight to Dr. Kakarla's opinion, rejecting portions of it he found unsupported.

In support of her argument, Plaintiff argues that her situation is similar to that in *Sherrill v. Comm'r of Soc. Sec.*, 2014 WL 1338114 (N.D. Ohio). There, the district court found the RFC unsupported because it contained a "vague limitation" which limited Plaintiff to a workplace which had a "readily accessible bathroom facility." *Id.* at *7. The court held this limitation was vague because it did not address the frequency or duration of the bathroom breaks. *Id. Sherrill* is distinguishable from the instant case for this very reason – the ALJ here *did* address, with specificity, the duration of time Plaintiff could be off-task. *See* Tr. 38. The undersigned finds the instant case more analogous to that cited by the Commissioner, *Baker v. Colvin*, 2015 WL 1383660 (N.D. Ohio). In *Baker*, the district court upheld an RFC where the ALJ limited Plaintiff to

15

sedentary work "except that he needed to sit or stand alternatively and at will, but would not be off task more than 10% of the work period." *Id.* at *7. The court held that the limitation there was not vague, and the ALJ's finding was supported by substantial evidence. For the reasons cited above, the undersigned reaches the same conclusion here.

For the foregoing reasons, the undersigned finds the ALJ did not err, and recommends the decision be affirmed in this regard.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI and DIB supported by substantial evidence and recommends the decision be affirmed.


                                                       s/James R. Knepp II
                                                       United States Magistrate Judge


*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).